593 So.2d 191 (1991)
Jerry Michael WICKHAM, Appellant,
v.
STATE of Florida, Appellee.
No. 73508.
Supreme Court of Florida.
December 12, 1991.
Rehearing Denied March 2, 1992.
*192 Nancy Daniels, Public Defender and David A. Davis, Asst. Public Defender, Second Judicial Circuit, Tallahassee, for appellant.
Robert A. Butterworth, Atty. Gen. and Richard B. Martell, Asst. Atty. Gen., Tallahassee, for appellee.
PER CURIAM.
Jerry Michael Wickham appeals his conviction and sentence of death. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const.
In March 1986, Wickham together with family members and friends, including children, were driving along Interstate 10 when they discovered they were low on money and gas. While at least some members of the party felt they should stop at a church for help, Wickham and others decided they would obtain money through a robbery. The group continued along Interstate 10 and exited at Thomasville Road in Tallahassee.
Proceeding north almost to the Georgia border, the group decided to trick a passing motorist into stopping. They placed one of the vehicles conspicuously on the roadside. One of the women, apparently accompanied by some of the children, then flagged down the victim, Morris "Rick" Fleming. The woman told Fleming her car would not work. Wickham later told a fellow inmate that he had deliberately used the woman and children because "that's what made the guy stop and that's what I was interested in."
After examining the car, Fleming told the woman he could find nothing wrong with it. At this time, Wickham came out of a hiding place nearby and pointed a gun at Fleming. Fleming then turned and attempted to walk back to his car, but Wickham *193 shot him once in the back. The impact spun Fleming around, and Wickham then shot Fleming again high in the chest. While Fleming pled for his life, Wickham shot the victim twice in the head.
Wickham then dragged the body away from the roadside and rummaged through Fleming's pockets. He found only four dollars and five cents. At this point, Wickham criticized the woman-decoy for not stopping someone with more money.
The group drove to a gas station and put two dollars' worth of gas in one of the cars, and two dollars' worth in a gas can. Wickham changed his clothes and threw his bloodstained pants and shoes into a dumpster. Wickham directed one of the others to throw the empty bullet casings and live rounds out the window. A short while later, the group drove past the murder scene and saw that the police and ambulances had begun to arrive. They then headed back south and drove to Tampa, obtaining more gas money by stopping at a church along the way.
At trial, defense counsel submitted extensive evidence about Wickham's prior psychological problems, which included extended periods of confinement in psychiatric hospitals during his youth. There also was evidence that Wickham was alcoholic, had suffered an abusive childhood, and that his father had deserted the family.
Other evidence, however, indicated that Wickham was not legally insane during the events in question and had not been drinking at the time of the murder, and that he had not been confined in mental institutions for many years. One expert, Dr. Harry McClaren, stated that Wickham both appreciated the criminality of the murder and chose to engage in this conduct despite his awareness of its nature. Dr. McClaren stated his opinion that Wickham had murdered Fleming to avoid arrest, because Wickham previously had been incarcerated for another robbery in Michigan. Although Dr. McClaren agreed that Wickham suffered from alcohol abuse, an antisocial personality disorder, and schizophrenia in remission, he concluded that these conditions did not impair Wickham's ability to understand the nature of his actions in murdering Fleming.
After being convicted of the murder, the jury recommended by a vote of eleven to one that Wickham be sentenced to death. The trial judge concurred after finding six aggravating circumstances and no mitigating circumstances.
As his first issue, Wickham contends that the trial court erred in limiting testimony about his alleged inability to form the specific intent to commit premeditated murder. Our review of the record discloses that the expert was allowed to testify fully about matters relevant to intent, including Wickham's brain damage, psychiatric history, low IQ, and inability to cope with normal life. The state acquiesced in the admission of this evidence. The only real limitation was that the expert was not permitted to draw purely legal conclusions from her observations of Wickham. It is axiomatic that the resolution of legal issues is properly left to the jury to resolve, using the legal instructions provided by the trial court. Accordingly, we find no error here.
Second, Wickham contends that the trial court erroneously admitted evidence that he had made plans to escape from the Leon County jail while being detained there. Apparently, nothing beyond mere planning or preparation ever occurred. We find no error. Mackiewicz v. State, 114 So.2d 684 (Fla. 1959), cert. denied, 362 U.S. 965, 80 S.Ct. 883, 4 L.Ed.2d 879 (1960).
As his third issue, Wickham argues that the trial court erred in finding that the murder was heinous, atrocious, or cruel. We agree. Recently in Cheshire v. State, 568 So.2d 908, 912 (Fla. 1990), we stated that this aggravating factor requires proof beyond a reasonable doubt of extreme and outrageous depravity exemplified either by the desire to inflict a high degree of pain or an utter indifference to or enjoyment of the suffering of another. The facts of the present case do not meet this standard. Id.
Fourth, Wickham contends that the trial court erred in finding that the murder *194 was cold, calculated, and premeditated. While the murder of Fleming may have begun as a caprice, it clearly escalated into a highly planned, calculated, and prearranged effort to commit the crime. It therefore met the standard for cold, calculated premeditation established in Rogers v. State, 511 So.2d 526 (Fla. 1987), cert. denied, 484 U.S. 1020, 108 S.Ct. 733, 98 L.Ed.2d 681 (1988), even though the victim was picked at random. We also find no evidence sufficient to establish that Wickham had a valid pretense of justification that would have negated this aggravating factor. See Banda v. State, 536 So.2d 221 (Fla. 1988), cert. denied, 489 U.S. 1087, 109 S.Ct. 1548, 103 L.Ed.2d 852 (1989).
As his fifth and sixth issues, Wickham argues that the trial court erred in failing to find and weigh mitigating evidence available in the record. We agree.
As we recently stated in Cheshire, the trial court's obligation is to both find and weigh all valid mitigating evidence available anywhere in the record at the conclusion of the penalty phase. Cheshire, 568 So.2d at 911 (citing Rogers, 511 So.2d at 534). Evidence is mitigating if, in fairness or in the totality of the defendant's life or character, it may be considered as extenuating or reducing the degree of moral culpability for the crime committed. Rogers, 511 So.2d at 534. Clearly, the evidence regarding Wickham's abusive childhood, his alcoholism, his extensive history of hospitalization for mental disorders including schizophrenia, and all related matters, should have been found and weighed by the trial court. Id.
However, we also must note that the State controverted some of this mitigating evidence, thus diminishing its forcefulness. Wickham had not been hospitalized for mental illness for many years and was not drinking at the time the murder was committed. His schizophrenia was in remission. Expert testimony indicated that he was not insane, and that he was able to appreciate the criminality of his actions in March 1986. This testimony is consistent with the facts of the murder and the actions and statements of Wickham.
In light of the very strong case for aggravation, we find that the trial court's error in weighing the aggravating and mitigating factors could not reasonably have resulted in a lesser sentence. Having reviewed the entire record, we find this error harmless beyond a reasonable doubt. Rogers, 511 So.2d at 535.
Seventh, Wickham argues that death is not a proportional penalty in this instance. The cases cited by Wickham for this proposition all deal with domestic violence, "heat-of-passion" murders, persons who were severely mentally disturbed at the time of the murder, or similar reasons. The facts of none of these cases approach the aggravated quality of the facts of the present case.
In killing Fleming, Wickham planned and executed a roadside ambush designed to lure a victim who believed he was helping a stranded woman and children. While some mitigating evidence was available, the case for aggravation here is far weightier. If a proportionality analysis leads to any conclusion, it is that death was a penalty the jury properly could recommend and the trial court properly could impose. Accordingly, this Court may not disturb the sentence on this ground. The conviction and sentence are affirmed.
It is so ordered.
SHAW, C.J., and OVERTON, GRIMES and KOGAN, JJ., concur.
BARKETT, J., concurs in part and dissents in part with an opinion.
McDONALD, J., concurs as to guilt and concurs in result only as to sentence.
BARKETT, Justice, concurring in part, dissenting in part.
I agree with the majority's conclusion as to guilt. I cannot agree, however, that the death penalty is appropriate for this defendant. If the death penalty is supposed to be reserved for the most heinous of crimes and the most culpable of murderers, Jerry Wickham does not seem to qualify. See State v. Dixon, 283 So.2d 1, 7 (Fla. 1973), *195 cert. denied, 416 U.S. 943, 94 S.Ct. 1950, 40 L.Ed.2d 295 (1974). At the time he committed this senseless murder, Jerry Wickham was a forty-year-old mentally deficient, socially maladjusted individual who had been institutionalized for almost his entire life.
Wickham was born on September 5, 1945, and spent the first ten years of his life in an alcoholic and abusive home. The beatings and abuse took their toll, and at age ten he was admitted to Northville State Hospital in Michigan. He was diagnosed schizophrenic and for the next ten years, from the age of ten until the age of twenty, remained in mental institutions. Throughout this period, he was continually evaluated as judgment-impaired, lacking insight, and unable to appropriately respond to reality. He was generally kept in closed wards and maintained on heavy medication, including daily doses of Thorazine and later Mellaril. During his confinement, his mother was killed in a car accident.
In early 1966, at the age of twenty-two, he was permanently discharged from the mental hospital with no directions, no support, and no medication. Not surprisingly, seven months later he attempted to rob a cab driver, shooting him in the process. In 1969, he was convicted and sentenced for armed robbery and spent the next fourteen years of his life in prison. He was released in 1983 and within the year was sent to prison for two more years for stealing a vehicle. He was released in 1985 and had been free about a year when this murder occurred.
Jerry Wickham, age forty at the time of the murder, had spent only two to three years outside of institutions since he was ten years old. All of his formative years had been spent, highly medicated, in mental institutions, deprived of the opportunity to develop whatever appropriate behavioral responses and socialization skills he was mentally capable of achieving. He had been born into, and continued to exist in, a milieu of violence. After the mental hospitals, he spent the balance of his adult life in jail which certainly did not provide any better opportunities for recovery.
The mental health experts for both the State and the defense agreed that Wickham is brain damaged. The unrebutted testimony indicated that he abused alcohol; he could not hold a steady job; he did not make sense when he talked; and he had acted irrationally his entire life. Even as an adult, he would wander away from home and talk to himself.
Obviously, Wickham's act in shooting the victim in this case cannot be condoned, and Wickham must not be permitted to remain in society where he is unable to function in an appropriate manner. Given Wickham's mental health history and diagnosis, however, I cannot conclude that his degree of culpability is such that he merits the death penalty. In discharging the responsibility to ultimately review every death sentence, I am persuaded that the heavy mitigating factors in this case outweigh the aggravating factors and, when compared to other cases where the death penalty was reversed, must conclude that Wickham should be sentenced to life imprisonment without the possibility of parole.